IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID SHAW, SR.,

            Petitioner,                No. CIV S-05-1506 MCE GGH P

    vs.

ROSANNE CAMPBELL, et al.,

            Respondents.         <u>ORDER</u>

_____/

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This action is proceeding on the amended petition filed February 7, 2006.  Petitioner challenges his 2000 conviction for kidnap for purpose of rape, forcible rape during the commission of kidnaping and burglary, attempted murder, assault for purposes of rape, burglary, assault by force likely to cause great bodily injury and terrorist threats.  Petitioner is serving a sentence of 24 years to life.

        Pending before the court are petitioner's motions for an evidentiary hearing and to expand the record filed January 25, 2007.  For the following reasons, these motions are denied.

<u>Background</u>

        To put the pending motions in context, the court will set forth the factual summary of petitioner's offense contained in the order by the California Court of Appeal denying

petitioner's motion for a new trial.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below:

> The victim, Sherrie L., met defendant outside a bar sometime after closing and asked him for a cigarette.  Defendant was drinking hard liquor and offered her some, which she declined.  Earlier, about 8:00 or 9:00 p.m., the victim had had two glasses of wine.  The victim and defendant were joined by two others, David R. and Bobbi C.  The foursome left the area seeking a place to use methamphetamine.  Along the way, defendant intimidated a person who approached the group asking for a cigarette.  Also along the way, defendant and David talked about having robbed and beaten a person the previous night.  Hearing the conversation, the victim was frightened.  While walking, defendant told the victim, "You know what I want."  Assuming defendant was proposing sex in exchange for drugs, the victim declined.  Defendant said, "We'll see."  After defendant and David obtained narcotics from someone behind a residence, David and Bobbi decided to leave.  The victim did not want to remain with defendant but Bobbi told her she would be fine.
>
> The victim followed defendant. When they reached some buildings, defendant wanted to go in a vacant building and use drugs but the victim declined to go inside.  Defendant physically forced her to go inside a shed and once inside, tripped her.  She fell and defendant landed on top, pinning her to the floor.  He told her to take her pantyhose down and that they "were going to have sex."  She wanted to use drugs first but defendant refused although he forced her to hold the wrapper with the drugs.  Defendant proceeded to rape the victim.  She asked defendant if he just liked having sex.  Defendant became so angry he hit her face and threatened to sodomize and kill her.  The victim started crying and defendant choked her until she was unconscious.  When she regained consciousness, she started struggling thinking he was still choking her but he was gone. [Footnote 1.]
>
> > [Footnote 1: When interviewed by officers, the victim claimed that when she regained consciousness, defendant was still in the shed and that she fought with him, scratching and hitting him, before she fled.  She also did not mention anything about drugs.]
>
> The victim fled the building, flagged down a truck, and went to the police station.  About 4:00 or 4:30 a.m., the victim reported to an officer that she had been raped.  The dispatcher and an officer described the victim as visibly shaken and crying.  The victim feared being alone.  The victim guided the officer to the shed where the rape occurred.  Inside, the officer found the victim's purse, shoes and a disposable cigarette lighter.  Later, another officer located one of the victim's missing false fingernails.
>
> The victim had red marks around her neck.  At the hospital, the victim was close to shock.  A sexual assault examination revealed a "small linear tear in the area of the posterior fourchette, the lower portion of the vagina" which occurred within 12 to 24 hours.  The examiner opined that the injury was consistent with nonconsensual sexual intercourse.  The victim also had a "pink area on the cervical mucuosa," an "abnormal finding" and indicated "recent trauma."

The parties stipulated that defendant did not have the owner's consent to enter the shed. When defendant was arrested and interviewed, he admitted meeting the victim, walking around with the victim and another couple, going into the shed and having sexual intercourse with the victim who he described as a "bar fly or a hooker." He claimed that he had consensual intercourse with the victim for which he paid $20. He denied that there had been a struggle, that he had choked the victim, or that he had threatened to kill the victim. After sexual intercourse, he left and the victim smoked what he thought was an illegal substance.

Defendant did not testify at trial. Called by the defense, Bobbi admitted having walked around with the victim, David, and defendant, to find a place for defendant and the victim to stay. Bobbi and the victim waited in front of a house while David and defendant went behind the house. The victim waited in front of the house alone while Bobbi went behind the house as well. Bobbi denied telling the victim that she would be safe with defendant. Bobbi did not recall an incident where someone asked for a cigarette. Bobbi did not overhear defendant and David talking about beating another person the previous night. Bobbi pays no attention to conversations that do not involve her.

Defendant's friend, Brooke B., noticed no scratches or bruises on defendant's body on the day he was arrested. Brooke had declined defendant's invitation for a date the evening prior to the incident.

The victim's acquaintance after-the-fact, Jason T., tried to convince the victim to change her story because he did not want to see anyone convicted of rape. Jason told a defense investigator that the victim claimed she agreed to exchange sex for drugs and had consented to sexual intercourse but that it "got weird."

Amended Petition, Exhibit 11, pp. 1-2.

Petitioner seeks an evidentiary hearing as to claim three alleging ineffective assistance of counsel based on counsel's failure to present testimony of a forensic alcohol-drug expert at trial to describe the effects of methamphetamine and alcohol on the victim's ability to accurately perceive and describe the charged events. The background to this claim is also contained in the opinion of the California Court of Appeal denying petitioner's new trial motion:

According to defendant's new trial motion and defendant's trial counsel, a police report reflects that the victim's blood was drawn at 8:00 a.m. She had a blood alcohol content of .02 percent. Her blood was not tested for controlled substances. During the victim's interview with an officer, she admitted having used methamphetamine earlier in the day, prior to the incident.

Prior to trial, defendant's trial counsel sought to admit evidence that the victim had used methamphetamine at some unspecified time on the day of the incident and that she was a regular user. The trial court advised that the evidence would be admitted if the defense planned to call a drug expert to testify about the effects of methamphetamine on a person's ability to perceive, recall, or recollect. Trial

3

counsel did not state that he had any plans to call a drug expert.  The trial court
excluded any mention of the victim's use of methamphetamine.

After the jury convicted defendant on all counts, defendant with new counsel,
moved for a new trial on the ground of ineffective assistance of counsel, arguing,
inter alia, trial counsel failed to employ a forensic alcohol/drug expert to analyze
the victim's blood content five or six hours prior to it testing .02 percent, and to
testify as to the effects of methamphetamine and alcohol, that is, hallucinations,
confusion and hysteria.  Defendant argued such evidence "would go directly to the
alleged victim's ability to perceive, recollect and remember the events on the
night in question" and "could also explain some of the hysteria and fear displayed
by the victim while in the safe confines of the police department itself."

In support of this claim, defendant submitted the declaration of Justin Birnbaum
and William Giguire with Park-Gilman Clinics in Burlingame (defense experts).
The defense experts stated that they had reviewed the supplemental police report
indicating that the victim's blood alcohol content was .02 percent and that she
denied smoking a controlled substance in front of defendant.  They opined that a
toxicological evaluation of the victim for alcohol and drugs "could be of critical
importance in evaluating the accuracy of the victim's recollection of the events
relating to the incident" because methamphetamine and/or alcohol "have the
potential to impact both the Central Nervous System (CNS) and the Autonomic
Nervous System (ANS)."

The defense experts noted that "clinical doses of 10 mg of methamphetamine
typically produces a concentration of approximately 0.50-4.0 mg/L in the urine.
These levels are typically seen during the first 24 hours after ingestion.  At this
level, the stimulant effects may produce elevated heart rate, increased cardiac
output, an increase in blood pressure, slight nervousness and alterness."  (Italics
added.)

The defense experts cited publications on the subject of amphetamine related
psychotic reactions noting the similarities between schizophrenia and symptoms
displayed by amphetamine abusers.  "Without developing psychosis,
amphetamine users may be restless, tense and fearful.  Some develop delusions of
persecution.  They may have auditory, tactile and visual hallucinations.  Strangely,
most are not disoriented and will act appropriately, given their paranoid state.
Generally, all of these symptoms disappear within a day or two of abstinence,
although marked depression may persist."

Admitting that "interpretation of methamphetamine concentrations is not a
straight forward task," the defense experts commented that the "effects usually
only last between 4-6 hours, yet the drug will be excreted in the *urine* for greater
than 24 hours."  (Italics added.)  Because the victim had a blood-alcohol content
(BAC) of " 0.20% at approximately 7:00 to 8:00 AM," the defense experts opined
that the victim's BAC at "2:00 a.m. was approximately 0.12% to 0.14%."  Based
on this assumption, they further opined "A person at such a BAC combined with
an unknown quantity of methamphetamine in their system is likely to exhibit over
confidence which would manifest itself in an increase in risk taking behavior.
Also apparent would be a decline in information processing abilities, diminution
of attention, judgment and self-control."  Citing a 1995 study, the defense experts

claimed that "methamphetamine reversed the subjective sedation produced by alcohol, yet the combination of the two agents resulted in a greater perceived state of intoxication." In conclusion, the defense experts stated, "The specific impairment(s) of the victim in this case is impossible to assess on the basis of the paucity of information in the report provided."

At trial, the nurse who examined the victim at the hospital testified that a urine sample was not taken.

At the hearing on the new trial motion, trial counsel testified. He admitted he had been aware of the victim's statement that earlier in the day she had ingested an unspecified amount of methamphetamine at some unspecified time prior to meeting defendant. Although aware that the victim's blood had been drawn at 8:00 a.m., trial counsel admitted having not sought testing for the presence of methamphetamine. He explained that defendant had admitted having sexual intercourse with the victim and that the issue was consent. Assuming the results showed she was "whacked out" on drugs and alcohol, trial counsel thought she would not be able to give consent and defendant might be charged with another crime, that is, having sexual intercourse with an unconscious person. He claimed he consulted with an alcohol forensic expert. Trial counsel also testified that the photograph of the scene showed the bag of the controlled substance on the floor.

A forensic toxicologist, testifying for the prosecution at the hearing, noted that the effects of methamphetamine are generally present four to six hours after the drug enters the bloodstream and dissipate in about eight hours. Symptoms include dilated eyes, increased heart rate/pulse rate, urine retention, dry mouth, slurred speech, talkative, and shaking. According to hospital records, the victim's blood pressure was "132 over 88," a little above normal, the victim's eyes were described as spontaneous, orientated, and obey commands and there was no indication of an elevated pulse rate. The toxicologist opined that the victim displayed no effects of methamphetamine.

Although defendant argued that had the victim's blood been tested an expert could have testified favorably at trial as to the effects of methamphetamine and alcohol, defendant did not seek to admit any test results of the victim's blood in support of his new trial motion. The prosecutor challenged defendant's evidentiary showing as inadequate arguing that the opinion of defendant's experts required a positive test result for methamphetamine and that defendant had failed to provide any blood test results. Without such results, the prosecutor argued, there could be no showing or prejudice, that is, no basis for concluding a different outcome was reasonably probable on retrial.

Concluding that trial counsel failed to retain and/or call a forensic expert concerning the effects of alcohol and methamphetamine ingestion and such failure was prejudicial to defendant, the trial court granted defendant's new trial motion.

Id., pp. 3-4.

        The California Court of Appeal reversed the order of the Superior Court and remanded with instructions to enter an order denying the new trial motion. The California Court

5

of Appeal found that absent a positive test result for methamphetamine, the defense experts'

opinions were meaningless.  Id., p. 5.  The state appellate court also found that the Superior

Court's order should be rejected even if methamphetamine was found in the victim's blood:

> Moreover, even assuming methamphetamine was present in the victim's blood, there is no showing of prejudice.  The victim's recollection of the event was substantially confirmed by defendant's admissions and Bobbi C.'s testimony at trial.  The victim's story about walking around with defendant, David and Bobbi and many of the specifics of their travels was confirmed by Bobbi.  Bobbi also confirmed that when she and David left, the victim and defendant were alone.  Defendant admitted to an officer that he met with the victim and walked around with her and another couple.  Defendant admitted that he and the victim went into the shed and had sexual intercourse.  The only issue at trial was consent.  The victim claimed he forced her into the shed and forced her to have sex while he claimed he paid $20.  The victim claimed he choked her; he denied the same.  The physical evidence supported the victim's testimony.  The sexual assault exam revealed a tear and recent trauma consistent with nonconsensual sexual intercourse.  Also the victim had red marks around her neck unexplained by the defense.
>
> The trial court erred in finding prejudice.  We need not consider whether counsel's performance as deficient.  The trial court abused its discretion in granting the new trial motion.

Id., p. 6.

After the superior court ordered a new trial on February 5, 2001, petitioner's new

counsel requested that the victim's blood sample be sent to a laboratory for toxicological

analysis.  RT at 746.  On February 20, 2001, defense counsel announced that the victim's blood

sample would be split and that the defense sample would be sent to Valley Toxicology.  RT at

750.

The report from Valley Toxicology, dated March 1, 2001, stated that the victim

had .09 mg/L of methamphetamine in her blood.  Amended Petition, Exhibit 5.  The California

Department of Justice (DOJ) July 25, 2003, report of its own testing concluded that the victim

had 161 nanograms per milliliter of methamphetamine.  Petitioner's Motion for Evidentiary

Hearing, Exhibit C.

On January 30, 2002, the California Court of Appeals decided the government's

appeal of the order granting the motion for a new trial.  The California Court of Appeal was

1  apparently unaware that the victim's blood had been tested.

2  Discussion

3       Petitioner seeks an evidentiary hearing to receive evidence concerning the effects

4  of methamphetamine combined with alcohol at the levels described in the police reports and

5  toxicology report generated by the Department of Justice.  Petitioner seeks to expand the record

6  to include a copy of the DOJ report of the victim's blood as well as the Valley Toxicology report

7  of the victim's blood.

8       Federal courts may hold evidentiary hearings in habeas actions under certain

9  prescribed conditions:

10       (2) If the applicant has failed to develop the factual basis of a claim in state court
         proceedings, the court shall not hold an evidentiary hearing on the claim unless
11       the applicant can show that--

12       (A) the claim relies on--

13       (i) a new rule of constitutional law...; or

14       (ii) a factual predicate that could not have been previously discovered through the
         exercise of due diligence; and
15
         (B) the facts underlying the claim would be sufficient to establish by clear and
16       convincing evidence that but for constitutional error, no reasonable factfinder
         would have found the applicant guilty of the underlying offense.
17

18  28 U.S.C. § 2254(e)(2).

19       The United States Supreme Court has interpreted the opening paragraph of 28

20  U.S.C. § 2254(e) to provide that where a petitioner has exercised diligence to "develop the

21  factual bases" of his claims in state court, the requirements of § 2254(e(2)(A) do not apply to his

22  request for an evidentiary hearing.  Williams v. Taylor, 529 U.S. 420, 435 (2000).  In other

23  words, a petitioner who has exercised such diligence will be taken out of the purview of section

24  2254(e)(2), or as the Ninth Circuit has sometimes termed it, subjected to the evidentiary standard

25  in "pre-AEDPA" cases.  Griffey v. Williams, 345 F.3d 1058 (9th Cir. 2003), vacated on other

26  grounds as moot, 349 F.3d 1157 (9th Cir. 2003) (petitioner died); Williams, 529 U.S. at 430

7

1   (showing under § 2254(e)(2) "applies only to prisoners who have 'failed to develop the factual

2   basis of a claim in state court proceedings.'").

3               Accordingly, "[a] petitioner who avoids the reach of § 2254(e)(2) qualifies for an

4   evidentiary hearing if the petitioner alleges facts, that if proven, would entitle him to relief and

5   the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts."

6   Griffey, 345 F.3d at 1065 (citing Jones v. Wood, 114 F.3d 1002, 1010, 1013 (9th Cir. 1997)).

7   "In other words, petitioner must allege a colorable constitutional claim."  Turner v. Calderon,

8   281 F.3d 851, 890 (9th Cir. 2002).

9               In the instant case, respondent argues that petitioner did not act diligently because

10  he failed to develop the state court record on the new trial motion with the toxicology reports.

11  Respondent observes that petitioner's counsel for the new trial motion requested that the blood

12  be tested after the Superior Court granted the motion.

13              At the time petitioner's counsel began pursuing the new trial motion, it was

14  undisputed that the victim had ingested methamphetamine and alcohol on the day of the rape.

15  Petitioner's counsel won the new trial motion based on these undisputed facts.  After winning

16  that motion, he immediately requested that the blood be tested.  The California Court of Appeal

17  reversed the Superior Court's order granting the new trial motion finding, in part, that even had

18  the blood been tested petitioner was not entitled to a new trial.  Under these circumstances, the

19  court does not find that petitioner did not diligently "develop the factual bases" of his claim in

20  state court.  Accordingly, the court applies the pre-AEDPA standard set forth above for

21  determining whether petitioner is entitled to an evidentiary hearing.

22              As set forth above, petitioner must allege facts, that if proven, would entitle him

23  to relief.  Petitioner must allege facts demonstrating that trial counsel acted unreasonably in

24  failing to obtain the testimony of a alcohol-drug expert at trial to the describe the effects of

25  alcohol and methamphetamine on the victim, and that had counsel obtained an expert, there is a

26  reasonable probability that the outcome of the trial would have been different.  Strickland v.

1   Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  Another way of phrasing this standard is that

2   the court's confidence in the actual outcome has been undermined.  Id. at 694.

3            In the amended petition, petitioner argues that the testimony of a forensic alcohol

4   and drug expert at his trial would have substantially impeached the credibility of the victim.

5   Relying on the Birnbaum/Giguire report, petitioner argues that an expert could have testified that

6   the victim's combined drug/alcohol intoxication tended to demonstrate that she was suffering

7   from impaired perceptions, paranoia, hallucinations and unwarranted fearfulness at the time of

8   the incident.  Amended Petition, p. 27.  The expert could have also testified, consistent with the

9   Birnbaum/Giguire report, that most methamphetamine users are not disoriented and will act

10  appropriately given their paranoid state.  The expert also could have testified, consistent with the

11  Birnbaum/Giguire report, that methamphetamine users exhibit overconfidence which may

12  manifest itself in risk taking behavior, as well as in a decline in information processing abilities,

13  judgment and self-control.  Petitioner argues that this evidence would have supported petitioner's

14  position that the victim misinterpreted the events, did not accurately recall petitioner's actions

15  and that she willingly accompanied petitioner into the shed to have consensual sex.

16           There are several problems with petitioner's argument.  First, while petitioner has

17  provided the court with the blood test results, he has provided no declaration from an expert

18  interpreting them in support of the pending motion.  The court does not know whether the results

19  demonstrate that the victim was intoxicated on methamphetamine at the time of the rape, or

20  whether the results indicate that the effects of the drug had worn off by the time of the rape.  The

21  court is reluctant to hold an evidentiary hearing where it is unclear whether an expert would

22  testify in support of the petitioner's claim.  In certain respects, even with these reports, this court

23  knows as much about the victim's methamphetamine intoxication as did the California Court of

24  Appeal, i.e., that the victim had used methamphetamine earlier that evening.

25           Even if the court were to accept the state court expert material as the material

26  petitioner would like to proffer in this federal action in order to obtain an evidentiary hearing, the

1  result is no different.  Bottom line was that the experts could not reach a conclusion on the

2  information presented.  All the experts could do was generalize about what *might* occur with

3  persons who had a certain level of methamphetamine in their system.  This information,

4  unrelated to the victim in this case, would have been, and was, insufficient under California law.

5  "'But speculation is not evidence, less still substantial evidence.' ( People v. Berryman, supra, 6

6  Cal. 4th at p. 1081, 25 Cal. Rptr. 2d 867, 864 P.2d 40; see People v. Wilson (1992) 3 Cal. 4th

7  926, 942, 13 Cal. Rptr. 2d 259, 838 P.2d 1212.)".  People v. Waidla, 22 Cal. 4th 690, 735, 94

8  Cal. Rptr. 2d 396 (2000).  "An expert's speculations do not rise to the status of contradictory

9  evidence, and a court is not bound by expert opinion that is speculative or conjectural."

10  McGonnell v. Kaiser Gypsum Co., 98 Cal. App. 4th 1098, 1106, 120 Cal. Rptr. 2d 23 (2002).  It

11  fares no better as evidence in federal court warranting an evidentiary hearing.  See Murtishaw v.

12  Woodford, 255 F.3d 926, 948 (9th Cir.2001) (holding that trial counsel was not ineffective where

13  counsel did not obtain blood samples for PCP testing because "[t]he tests would not have pinned

14  down the dates on which [defendant] used PCP, nor would they have shown that [defendant] was

15  intoxicated by PCP at the time of the shootings.").  Moreover, if one were to believe that part of

16  petitioner's responses to the police where he stated that the victim was using illegal substances

17  *after* the sexual event, the effect of methamphetamine use prior to, or at the time of, the sexual

18  event is all the more impossible to figure out.

19          Thus, the record of methamphetamine usage, at unknown times in unknown

20  amounts with unknown effect vis-a-vis *this* victim does not *per se* warrant an evidentiary

21  hearing.

22          As importantly, the evidence does not support petitioner's claim that the victim

23  was suffering from impaired perceptions, paranoia, etc. to a degree that her ability to perceive

24  events was undermined.  First, as noted by the California Court of Appeal, the victim's

25  recollection of the event was substantially confirmed by defendant's admissions and Bobbi C.'s

26  testimony at trial.  If the victim's perceptions were impaired to a degree so as to undermine her

1  credibility, it is very unlikely that her recollection of the events leading just up to the rape would

2  have been as accurate as they were.

3            In addition, the physical evidence strongly supported the victim's claim that she

4  had been raped.  As noted by respondent in her opposition, Sergeant Cummings found one of the

5  victim's fingernails in the shed.  RT at 160-164.  Nurse Clifton testified that the victim's neck

6  was reddened.  RT at 222-224.  Dr. Green, petitioner's expert, also concluded that the victim's

7  next injuries were consistent with recent strangulation trauma.  Amended Petition, Declaration of

8  Dr. Green, ¶ 9.

9            Nurse Clifton's examination of the victim revealed a small linear tear in her

10 vagina, consistent with non-consensual sex.  RT at 230-231, 235-237.  Dr. Green, states in his

11 declaration that [a]lthough this type of injury [i.e. vaginal tearing] is commonly seen in sexual

12 assault victims and is therefore consistent with a history of non-consensual penetration, this

13 injury is also seen after consensual intercourse, so although it is most consistent with assault, it

14 should not be considered diagnostic (i.e. medically certain) or conclusive since it can occur in

15 consensual intercourse also."  Id., ¶ 8.  Dr. Green's statement regarding the victim's vaginal

16 injury does not strongly support petitioner's claim that the victim received this injury through

17 consensual sex.[1]

18            For the reasons discussed above, the court finds that petitioner had not alleged

19 facts, that if proven, would entitle him to relief.  On this ground, petitioner's motions for an

20 evidentiary hearing and to expand the record are denied.  The court will issue findings and

21 recommendations addressing the merits of the petition shortly.

22

23       [1]  The court observes that in his declaration filed in support of the amended petition,
    petitioner now claims that after having consensual sex with the victim, they got into an argument
    about money and drugs and he grabbed her around the throat and shook her a few times.
24  Amended Petition, Petitioner's Declaration, ¶¶ 19-20.  This version of events is, of course,
    inconsistent with the version of events petitioner originally told to the police, where he denied
25  strangling the victim.  See Amended Petition, Exhibit 4, Cummings report.  It appears that
    petitioner is now attempting to mold his story to the interpretation of the evidence given by his
26  own experts.

1          Accordingly, IT IS HEREBY ORDERED that petitioner's January 25, 2007,

2  motions for an evidentiary hearing and to expand the record are denied.

3  DATED: 9/20/07

4                            /s/ Gregory G. Hollows

5                            UNITED STATES MAGISTRATE JUDGE

6  sh1506.evi

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26