1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10    DAVID SHAW, SR.,

11                      Petitioner,                   No. CIV S-05-1506 MCE GGH P

12          vs.

13    ROSANNE CAMPBELL, et al.,                       ORDER and

14                      Respondent.                   FINDINGS AND RECOMMENDATIONS

15    _____/

16    *Introduction and Summary*

17                This is a difficult habeas petition in some respects.  David Shaw, petitioner, was

18    convicted of numerous charges including kidnapping with intent to commit rape, forcible rape

19    during the commission of a burglary, attempted murder and several lesser charges.  His sentence,

20    25 years to life imprisonment, was imposed pursuant to the "one strike" law of Cal. Penal Code §

21    667.61(a).  The victim[1] in this case was a prostitute, and the major issue in the case involved the

22    credibility of the victim, i.e., she had testified to going with petitioner for the purpose of

23    ingesting drugs, but was forcibly raped instead; petitioner urged as his defense that the victim had

24    _____

25            [1] The undersigned uses the term "victim," as there has been a conviction of petitioner for
      abusing the complaining witness in this case, and it is less cumbersome than typing "complaining
26    witness" every time.

                                                      1

1    propositioned the exchange of drugs for sex.  The victim had substantial objective corroboration

2    for her position; petitioner had evidence from other witnesses which would potentially,

3    substantially detract from the victim's credibility.  Nevertheless, petitioner's credibility is at issue

4    as well.

5    The court has disposed of one issue previously in this case – an ineffective

6    assistance of counsel issue involving the lack of a drug expert to testify to the victim's lack of

7    credibility (competency to remember facts) because she was under the influence of drugs and

8    alcohol at the time.  The order denying an evidentiary hearing was filed September 20, 2007, and

9    affirmed by the undersigned on reconsideration, December 20, 2007.  Because the orders deny an

10   evidentiary hearing on the ultimate determination of sufficient prejudice, it follows that the entire

11   claim should be denied as well.  Substantial and not so substantial claims remain.

12   1.  Exclusion of petitioner's witnesses who would have testified to the victim's

13   previous attempts to seek drugs in exchange for sex;

14   2.  Ineffective assistance of counsel on account of counsel's failure to renew

15   attempts to have the impeachment witnesses (claim 1) testify after petitioner testified on direct

16   examination that she did not engage in exchanges of sex for drugs;

17   3.  The previously adjudicated ineffective assistance of counsel claim for failure to

18   present forensic testimony regarding the intoxicated state of the victim;

19   4.  The de novo standard utilized by the Court of Appeal in determining to reverse

20   the new trial grant violated due process;

21   5.  Ineffective assistance of counsel for failure to call a forensic sexual assault

22   expert;

23   6.  Ineffective assistance of counsel for failure to exclude evidence that petitioner

24   was a violent person;

25   7.  Ineffective assistance of counsel for failure to call three witnesses who could

26   have impeached the credibility of the victim; (this is a reprise of Claim 2, although it starts out as

2

1    a reprise of Claim 6);

2            8.  Ineffective assistance of counsel for failure to properly advise petitioner about

3    his right to testify and failure to call petitioner as a witness;

4            9.  Ineffective assistance of counsel for failure to investigate the charged offenses,

5    failure to call favorable witnesses, and presentation of prejudicial testimony;

6            10.  Ineffective assistance of counsel due to poor cross-examination;

7            11.  Petitioner's right to a jury trial was violated when jury was instructed that the

8    shed in which sex occurred was "closed to the public" as a matter of law;

9            12.  Ineffective assistance of counsel regarding failure to investigate petitioner's

10   mental illness;

11           13.  Claim Incorporated into Claim 8;

12           14.  Claim abandoned (petitioner now concedes that he assaulted the victim, but

13   not until after the sex act was completed).

14           For the reasons set forth herein, an evidentiary hearing is ordered on Claim 2; the

15   remaining claims should be denied.

16   *Legal Standards*

17           The legal standards for evidentiary hearings have been previously discussed in

18   connection with the order denying evidentiary hearing, and will not be repeated here.  The

19   general AEDPA legal standards are as follows:

20           The AEDPA "worked substantial changes to the law of habeas corpus,"

21   establishing more deferential standards of review to be used by a federal habeas court in

22   assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

23   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

24           In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

25   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

26   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

1    between "contrary to" clearly established law as enunciated by the Supreme Court, and an

2    "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies

3    to two situations: (1) where the state court legal conclusion is opposite that of the Supreme

4    Court on a point of law, or (2) if the state court case is materially indistinguishable from a

5    Supreme Court case, i.e., on point factually, yet the legal result is opposite.

6         "Unreasonable application" of established law, on the other hand, applies to

7    mixed questions of law and fact, that is, the application of law to fact where there are no factually

8    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

9    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the

10   AEDPA standard of review which directs deference to be paid to state court decisions. While the

11   deference is not blindly automatic, "the most important point is that an *unreasonable* application

12   of federal law is different from an incorrect application of law....[A] federal habeas court may not

13   issue the writ simply because that court concludes in its independent judgment that the relevant

14   state-court decision applied clearly established federal law erroneously or incorrectly. Rather,

15   that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

16   1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the

17   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

18   authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

19         The state courts need not have cited to federal authority, or even have indicated

20   awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S.

21   Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is

22   contrary to, or an unreasonable application of, established Supreme Court authority. Id. An

23   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

24   occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003). Moreover,

25   the established Supreme Court authority reviewed must be a pronouncement on constitutional

26   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

1  binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

2       However, where the state courts have not addressed the constitutional issue in

3  dispute in any reasoned opinion, the federal court will independently review the record in

4  adjudication of that issue.  "Independent review of the record is not de novo review of the

5  constitutional issue, but rather, the only method by which we can determine whether a silent state

6  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

7  2003).

8  *Facts*

9       The facts of this case throughout the police investigation, the preliminary hearing,

10 and trial are important in that the facts demonstrate that both petitioner and the victim, aka

11 complaining witness, would prevaricate at times when they thought the truth would be

12 detrimental to them.  Petitioner makes much of his claimed error in the inability to impeach the

13 credibility of the victim, and in some situations he is potentially correct, but fails to grasp that his

14 own early prevarications and later  "shifting sands" explanations harm his prejudice analysis.

15 This makes for a very difficult overall analysis in this habeas petition.

16       The court will repeat the rendition of facts given by the Court of Appeal for trial,

17 as those facts were accurate as to what took place at that time.  However, at the end of that

18 recitation, the court will point out material inconsistencies in both the petitioner's and victim's

19 pretrial versions.

20        The victim, Sherrie L., met defendant outside a bar sometime after
         closing and asked him for a cigarette.  Defendant was drinking
21       hard liquor and offered her some, which she declined.  Earlier,
         about 8:00 or 9:00 p.m., the victim had had two glasses of wine.
22       The victim and defendant were joined by two others, David R. and
         Bobbi C.  The foursome left the area seeking a place to use
23       methamphetamine.  Along the way, defendant intimidated a person
         who approached the group asking for a cigarette.  Also along the
24       way, defendant and David talked about having robbed and beaten a
         person the previous night.  Hearing the conversation, the victim
25       was frightened.  While walking, defendant told the victim, "You
         know what I want."  Assuming defendant was proposing sex in
26       exchange for drugs, the victim declined.  Defendant said, "We'll

5

see." After defendant and David obtained narcotics from someone behind a residence, David and Bobbi decided to leave. The victim did not want to remain with defendant but Bobbi told her she would be fine.

The victim followed defendant. When they reached some buildings, defendant wanted to go in a vacant building and use drugs but the victim declined to go inside. Defendant physically forced her to go inside a shed and once inside, tripped her. She fell and defendant landed on top, pinning her to the floor. He told her to take her pantyhose down and that they "were going to have sex." She wanted to use drugs first but defendant refused although he forced her to hold the wrapper with the drugs. Defendant proceeded to rape the victim. She asked defendant if he just liked having sex. Defendant became so angry he hit her face and threatened to sodomize and kill her. The victim started crying and defendant choked her until she was unconscious. When she regained consciousness, she started struggling thinking he was still choking her but he was gone. [Footnote 1.]

> [Footnote 1: When interviewed by officers, the victim claimed that when she regained consciousness, defendant was still in the shed and that she fought with him, scratching and hitting him, before she fled. She also did not mention anything about drugs.]

The victim fled the building, flagged down a truck, and went to the police station. About 4:00 or 4:30 a.m., the victim reported to an officer that she had been raped. The dispatcher and an officer described the victim as visibly shaken and crying. The victim feared being alone. The victim guided the officer to the shed where the rape occurred. Inside, the officer found the victim's purse, shoes and a disposable cigarette lighter. Later, another officer located one of the victim's missing false fingernails.

The victim had red marks around her neck. At the hospital, the victim was close to shock. A sexual assault examination revealed a "small linear tear in the area of the posterior fourchette, the lower portion of the vagina" which occurred within 12 to 24 hours. The examiner opined that the injury was consistent with nonconsensual sexual intercourse. The victim also had a "pink area on the cervical mucuosa," an "abnormal finding" and indicated "recent trauma."

The parties stipulated that defendant did not have the owner's consent to enter the shed. When defendant was arrested and interviewed, he admitted meeting the victim, walking around with the victim and another couple, going into the shed and having sexual intercourse with the victim who he described as a "bar fly or a hooker." He claimed that he had consensual intercourse with the victim for which he paid $20. He denied that there had been a struggle, that he had choked the victim, or that he had threatened to

kill the victim.  After sexual intercourse, he left and the victim smoked what he thought was an illegal substance.

Defendant did not testify at trial.  Called by the defense, Bobbi admitted having walked around with the victim, David, and defendant, to find a place for defendant and the victim to stay. Bobbi and the victim waited in front of a house while David and defendant went behind the house.  The victim waited in front of the house alone while Bobbi went behind the house as well.  Bobbi denied telling the victim that she would be safe with defendant. Bobbi did not recall an incident where someone asked for a cigarette.  Bobbi did not overhear defendant and David talking about beating another person the previous night.  Bobbi pays no attention to conversations that do not involve her.

Defendant's friend, Brooke B., noticed no scratches or bruises on defendant's body on the day he was arrested.  Brooke had declined defendant's invitation for a date the evening prior to the incident.

The victim's acquaintance after-the-fact, Jason T., tried to convince the victim to change her story because he did not want to see anyone convicted of rape.  Jason told a defense investigator that the victim claimed she agreed to exchange sex for drugs and had consented to sexual intercourse but that it "got weird."

Amended Petition, Exhibit 11, pp. 1-2.

In important particulars, the victim never told the investigating officer that she and petitioner were initially engaged in a search for drugs with petitioner and others for later partying. Amended Petition, Exhibit 4 (Cummings Police Report).  She testified to such in the preliminary examination and at trial.  We know from the previous evidentiary hearing proceedings that the victim was untruthful/inaccurate about how much alcohol she had imbibed prior to her encounter with petitioner because of the amount of alcohol in her system at 8:00 a.m. the next morning.  At trial, the victim testified that petitioner tripped her, forced her to the ground, and immediately thereafter, engaged in the rape.  RT 37.  She also testified, however, that *she* asked if they could take drugs before petitioner continued with his way prior to vaginal entry.  RT 38.  At the preliminary examination, the victim testified that she was asked to lay down; petitioner had attempted to pay her with drugs prior to the forceful rape, that she did not want any but she took the bag of drugs nevertheless.  RT (Preliminary Ex) 17-18.  In the police report (Cummings), the

1   victim stated that petitioner was present when she regained consciousness (petitioner having

2   choked her), and still engaged in the rape; he ejaculated after she regained consciousness.  The

3   victim struggled with petitioner at this time.  At preliminary examination, the victim stated that

4   when she regained consciousness, petitioner was not there.  RT (Preliminary Ex) 21.  At trial,

5   petitioner was again there – maybe, but not when she opened her eyes.  RT 41.  She thought

6   petitioner may have ejaculated when she was unconscious.  RT 125.

7            Petitioner did not testify at trial.  Nevertheless, he told Officer Cummings, in fact

8   he was adamant, that he did not use drugs.  Petitioner stated that he told the victim such as well,

9   and told her he was just looking for a good time, "sex straight up."   In this habeas proceeding,

10  petitioner asserts that he was engaging in a sex for drugs transaction – with petitioner,

11  presumably, supplying the drugs he was adamant about never using.  Moreover, petitioner never

12  claimed to the officer that he desired to exchange drugs for sex – he only mentioned to that

13  officer that he gave the victim $20.00.  He denied ever physically abusing the victim at any time;

14  he now concedes that he did so when after the sex event, they argued about payment.

15           The apparent first mention in the court records of an alleged transaction of sex for

16  drugs was by one referenced by the Court of Appeal as "Jason T" who was an after-the-fact

17  acquaintance of the victim; Jason stated that the victim had agreed to exchange drugs for sex, but

18  then it got "weird."  Other than Jason's belief that the rape charge should not have been pursued

19  by the victim, there does not appear to be any reason why Jason would have made up this

20  statement.

21  *Discussion*

22       A.  Exclusion of Petitioner's Witnesses Who Would Have Testified to the Victim's

23          Previous Attempts to Seek Drugs in Exchange for Sex

24           Petitioner proffered three witnesses who would have testified about the victim's

25  proclivities in offering sex in exchange for drugs.  The first two would have recounted

26  petitioner's offer, but for reasons unimportant here, the offers were refused.  The third witness

8

1  would have testified to a consummated transaction of sex in exchange for drugs approximately

2  one month prior to the asserted rape in this case.

3          California has a rape shield law.  Cal. Evid. Code §§ 1103, 782.  Section 1103 is a

4  flat prohibition of using a complaining witness' prior sexual conduct as evidence that the witness

5  consented to having sex.  Section 782 modifies this prohibition by allowing the trial judge, in the

6  exercise of discretion, to admit such prior conduct to attack the credibility of the complaining

7  witness, i.e., once the witness testifies the witness' credibility may be attacked.  Under § 782, the

8  judge decides first whether to have a hearing outside the presence of any jury where the proffered

9  witnesses would be preliminarily heard, and then, if a hearing is allowed, decides whether the

10 witnesses will testify before the jury and in what manner.  In order not to allow the exception to

11 swallow the rule, judges must ensure that the probative value of the evidence substantially

12 outweighs the prejudice from admission of such evidence to the conduct of the trial and the

13 interests of the victim.  See People v. Chandler, 56 Cal. App. 4th 703, 65 Cal. Rptr. 2d 687

14 (1997).

15         However, exclusion of relevant evidence implicates the Sixth Amendment.

16 Michigan v. Lucas, 500 U.S. 145, 111 S. Ct. 1743 (1991) (rape shield case).  On the other hand,

17 states have a legitimate interest in shielding rape complaining witnesses from harassing inquiry

18 into their past sexual conduct.  Id.  It should go without saying that simply because a person says

19 "yes" to sex on one, or numerous occasions, that person may well have said, "no" or otherwise

20 resisted sexual overtures, on a particular occasion.  Nevertheless, "[r]estrictions on a criminal

21 defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or

22 disproportionate to the purposes they are designed to serve.'"  Id. at 151, 111 S. Ct. 1747.  The

23 Ninth Circuit has specifically upheld use of the federal rape shield law along these same lines.

24 Lajoie v. Thompson, 217 F.3d 663 (9th Cir. 2000).

25         In Lajoie, petitioner therein sought to introduce evidence that the victim he was

26 accused of molesting had actually been raped previously by another man.  This evidence could

9

have been relevant to show an alternate explanation to the prosecution's evidence of injury to the

hymen, and that the young victim could have learned about sexual acts and genitalia from a

person other than Lajoie (evidently of some importance in the facts of that case).  The Ninth

Circuit determined that the evidence was not unduly prejudicial to the victim, i.e., the child

would not have been cast in an unfavorable light because the evidence involved a previous rape.

Lajoie is not pertinent to the issue presented by this claim as no objective facts

could be proven or disproven by the previous offers of sex for drugs.  The trial court in

petitioner's case found that the evidence of the first two unconsummated offers was not relevant

at all.  Petitioner's Exhibit 18; see also RT 3-4.  The Court of Appeal agreed.  The victim had not

testified at this time, and the trial court could not determine that the prior offers would

necessarily go to the victim's credibility.  Again, even prostitutes can say "no" to a particular,

proffered sexual transaction; thus, the past offers of an exchange of sex for drugs, even the

consummated one, were not relevant under California law to prove that the victim had followed

that past course on the night in question.  Indeed, Cal. Evid. Code § 1103 precluded its use for

that purpose.  Nor, in terms of the victim's credibility, could the trial judge know at the time the

motion was denied precisely to what the victim would testify.  The trial judge did as most trial

judges would do – his ruling was without prejudice depending on the testimony which came out

at trial.

The rulings of the state courts were correct.  Petitioner in no way has shown that

the ruling to exclude without prejudice was AEDPA unreasonable.  The matter of counsel's

conduct after the victim had testified that she did not, as a practice, exchange sex for drugs is

another, problematic question.

\\\\\

\\\\\

\\\\\

\\\\\

B. <u>Ineffective Assistance of Counsel on Account of Counsel's Failure to Renew Attempts</u>

<u>to Have the Impeachment Witnesses (Claim 1) Testify after Petitioner Testified on Direct</u>

<u>Examination That She Did Not Engage in Exchanges of Sex for Drugs</u>

Trial counsel did not wish to have the denial of the in limine motion as the last

word on the matter.  He pressed the judge to keep the possibility of calling the "sex for drugs"

witnesses in case the circumstances at trial presented a credibility matter.

> Mr. Prather: Your Honor, is it denied with prejudice or without prejudice?  My
> concern is–
> The Court: You always– obviously would always have the right to raise it again
> during trial.
> Mr. Prather: Thank you.
> The Court: If facts were sufficient to justify that.
> Mr. Prather: Thank you, your Honor.  *That's what I was looking for.*

Petitioner' Exhibit 18, p.7 (emphasis added).

The trial court judge addressed the matter the first day of trial, reaffirming his previous ruling,

and indicating that should defense counsel think circumstances had changed, he would have to

move for a hearing outside the presence of the jury.  RT 3, 13.  Again counsel emphasized his

need to bring to the court's attention a renewed motion to have the "sex for drugs" witnesses

testify if circumstances so warranted.

> Mr. Prather: Yes.  And I understand that, your Honor.  One question, though, if,
> during the course of the trial, if– if a response by a question asked by Mr. Enos
> opens up the door–
> The Court: We all–
> Mr. Prather: –in whatever way–
> The Court: We all run the risk, when we practice law, of opening doors we never
> wanted to open.
> Mr. Prather: Okay.
> The Court: We'd deal with that.

RT 14.

At trial, the victim testified that the plan that evening, after she had met petitioner

outside of the "Playroom," was "to do some methamphetamines."  RT 27.  On the way to this

place to do methamphetamine, wherever it was going to be, the victim became aware of the "real

reason" she was accompanying petitioner:

1    Q. [Prosecutor]– At some point during the walk did the subject of sex come up?
A. [The Victim]  Yes.

2    Q. Can you describe that for us?
A. David said something like, "You know what I want."  And I stepped off the

3    street corner with– as I knew of her as Petra, and said, "Well, if you want– if you want sex for dope," I said, "then I'd just as soon you keep your dope because I– I

4    didn't– *I don't do that for dope."*

5    RT 30 (emphasis added)

6    The answer was even read back for the jury.  Nevertheless, counsel did not at any point in the

7    trial move the court to reopen the matter of calling the "sex for drugs" witnesses.

8            The issue of ineffective assistance of counsel was raised on direct appeal, but the

9    Court of Appeal turned back the claim finding: "Defense counsel could have reasonably

10    concluded the victim's testimony would not alter the trial court's prior conclusion.  Thus,

11    counsel's determination not to seek to admit inadmissible evidence does not constitute

12    ineffective assistance of counsel."  <u>People v. Shaw</u>, 2003 WL 22293580 *7 (Cal. App. 2003).

13            With due respect to the Court of Appeal, its speculation of what might have been

14    in counsel's mind, a resigned determination not to raise anew the issue of the three witnesses, is

15    totally refuted by the record.  As quoted above, trial counsel stated *twice* that he wished to have

16    the trial ruling without prejudice so that if circumstances at trial so warranted, he could revisit the

17    matter.  Counsel's state of mind was not one of resignation to defeat after the trial judge's ruling.

18    Counsel was looking for testimony precisely as that given by the victim.  The victim's testimony

19    cannot reasonably be read any other way – that as a matter of her own life's code, "I don't do that

20    for dope."  Such testimony was entirely inconsistent with her actual practice (if the defense

21    witnesses were to be believed).  The defense at this point had pressed the judge indicating that it

22    would attempt to prove that on the night in question, it would show that the victim had consented

23    to a sex for drugs transaction.  If this did not open the door to attack the victim's credibility that

24    she would never do such a thing, nothing could.  The matter of the victim's credibility on an

25    important point (not a collateral matter), and a point which invoked the exception to the rape

26    shield law, was now directly at issue.  Any reasonable counsel would have as soon as practicable

asked the trial court to reconsider the matter after such testimony – these were precisely the circumstances in which the trial judge said he would reconsider the matter.  The undersigned finds the Court of Appeal's determination to the contrary to be AEDPA unreasonable in light of the record.

The more difficult issue is that of prejudice in light of the record as a whole.  The prejudice involves two components: the chances that the trial judge would have reopened the California law procedures to determine the fitness for testimony of the "sex for drugs" witnesses, and whether the failure to have the witnesses testify undermines the court's confidence in the outcome of the trial.

The undersigned cannot determine either matter without an evidentiary hearing.  The witnesses may be entirely credible; they may not have any credibility.  If the court were to believe them, there exists a reasonable possibility that a retrial would be recommended in this matter.  The court is not finding such at this time.  Any finding will await a hearing of the witnesses and weighing their testimony with the record as a whole.  Thus, an evidentiary hearing is ordered as set forth in the conclusion of this Order/Findings and Recommendations.[2]

C.  The Previously Adjudicated Ineffective Assistance of Counsel Claim for Failure to Present Forensic Testimony Regarding the Intoxicated State of the Victim

As referenced above, petitioner claimed ineffective assistance of counsel for failure of counsel to retain and present a forensic expert regarding the possible intoxicated state of the victim.  Petitioner was denied an evidentiary hearing on this claim.  Without such a hearing, petitioner cannot prove either requirement of ineffective assistance of counsel, and the claim should be finally denied.

---

[2] The undersigned does not agree with the trial court that impeachment of a witness can only come into play if a witness testifies in court with a present intent to make the statement as opposed to simply repeating during testimony what was said out of court at the time.  RT 740. The important fact is *that the statement was made*, not where it was made.  The victim's state of mind vis-a-vis exchanging sex for drugs at the time of her encounter with petitioner was the more important issue than whether she was willing to presently affirm that statement in court.

1    D.  The De Novo Standard Utilized by the Court of Appeal in Determining to Reverse the

2    New Trial Grant Violated Due Process

3          Petitioner believes that the state Court of Appeal erred when (according to

4    petitioner) it reviewed the appeal from the order granting new trial on a de novo basis.  Petitioner

5    does not cite any Supreme Court authority for the proposition that the state law procedural

6    question posed, in the event petitioner is correct in his characterization, violates any part of the

7    federal Constitution – even that involving liberty interests.  The undersigned can find no such

8    authority either.  The claim should be denied.

9    E.  Ineffective Assistance of Counsel for Failure to Call a Forensic Sexual Assault Expert

10          Petitioner asserts his trial counsel was ineffective for failing to call an expert

11   sexual assault forensic witness to rebut the testimony of Nurse Clifton who rendered an opinion

12   that the tear to the victim's posterior fourchette was indicative of non-consensual intercourse.

13   Nurse Clifton did testify that such a tear can take place even in consensual intercourse, but that

14   she believed the sex at issue to be non-consensual.  Nurse Clifton believed this to be so because

15   of the absence of lubrication evidence and the bruise like area on the cervical mucosa.  RT 236-

16   237.  She believed the tear to have occurred within the last 12 to 24 hours.  RT 251.

17          At the motion for new trial, petitioner produced the declaration of Dr. Greene in

18   an attempt to make the same point he makes here.  Volume 1, Exhibit 2, filing of 9/5/2006.

19   However, the points made by Dr. Green fall far short of those necessary to undermine the court's

20   confidence in the verdict because of a lack of a defense sexual forensic expert at trial.  Dr. Green

21   opined:

22          Nurse Clifton's conclusion was that the injury was consistent with
             the patient's history of non-consensual penetration.  In my opinion,
23          this finding must be interpreted cautiously.  Although this type of
             injury is commonly seen in sexual assault victims and is therefore
24          consistent with a history of non-consensual penetration, this injury
             is also seen after consensual intercourse, so although *it is most*
25          *consistent with assault*, it should not be considered diagnostic (i.e.,
             medically certain) or conclusive since it can occur in consensual
26          intercourse also.

14

1  Declaration at 2-3 (emphasis added).

2  Dr. Green went on to say that the strangulation marks were indeed consistent with recent

3  strangulation trauma.

4  The undersigned finds it difficult to conceive of how this declaration helps

5  petitioner in his burden of proof here.  As set forth in <u>Strickland v. Washington</u>, 466 U.S. 668,

6  694, 104 S. Ct. 2052, 2068 (1984), petitioner must demonstrate a reasonable probability that the

7  outcome of the proceeding would have been different, aka, that the court's confidence in the

8  outcome of the proceeding has been undermined.

9  Dr. Green testified similarly to Nurse Clifton and agreed that the tear was "most

10  consistent" with forcible entry.  He simply cannot say that this conclusion was "medically

11  certain."  And individual evidence, unlike the verdict, does not have to be of the "beyond

12  reasonable doubt" standard.  Nurse Clifton's testimony, as well as Dr. Green's, was corroborative

13  of the prosecution's case as a whole.[3]

14  Petitioner does not proffer any evidence in this federal proceeding aside from the

15  declaration of Dr. Green.  Thus, the court assumes that Dr. Green would testify at evidentiary

16  hearing in conformance with his declaration.  Based on that declaration, the court easily

17  concludes that its confidence in the outcome is not undermined by the lack of presentation of a

18  forensic sexual assault expert.  Indeed, counsel would have been arguably unreasonable if he had

19  called a witness like Dr. Greene.

20  F. <u>Ineffective Assistance of Counsel for Failure to Exclude Evidence That Petitioner Was</u>

21  <u>a Violent Person</u>

22  The victim in this case testified to her overhearing "something between the two

23  men" at the time she first met and accompanied petitioner, and that something was: "The men

24  were having a conversation about something they had – had happened with them the night

25

26  [3] Petitioner makes no claim here that the nurse's testimony was inadmissible insofar as it lacked sufficient probability.

1   before, about rolling this guy for money and beating him up." RT 29.  The victim testified that

2   this conversation caused her concern.  Id.  Defense counsel's hearsay exception was overruled

3   after the prosecution explained that the conversation went to "state of mind."

4         Petitioner asserts that his counsel was ineffective because "hearsay" was the

5   wrong objection, and that counsel should have objected on the basis that the evidence, although

6   technically relevant was far more prejudicial than probative.  Petitioner asserts that the testimony

7   painted him as a violent person, predisposing the jury to believe that he was probably violent

8   with petitioner as well.

9         First of all, petitioner is entitled to effective representation, not mistake free

10   representation.  Wright v. Van Patten, __U.S.__, 128 S. Ct. 743, 746 (2008).  Not every missed

11   objection is grounds for a retrial.  Secondly, assuming the testimony was admitted at least in part

12   for the truth of the matter asserted, i.e., that petitioner had actually been involved in rolling an

13   individual, the hearsay exception was not erroneous as the victim clearly did not indicate

14   petitioner's statements as opposed to the collective statements of a party and non-party.  We do

15   not really know what admissions could be attributed to petitioner as opposed to the other man.

16   For all we know, petitioner may have done very little talking.  The prosecutor's reference to

17   "state of mind" goes to the *declarant's* state of mind, not the hearer, Cal. Evid. Code § 1250, and

18   we cannot really know from the testimony what that state of mind was vis-a-vis petitioner, and

19   why it became relevant to the events on the rape night, unless simply to introduce inadmissible,

20   specific act character evidence.

21         Of course, the victim's state of mind was relevant, and insofar as the testimony

22   was not admitted for the truth of the matter asserted, but simply as an operative fact of why the

23   victim became concerned, i.e., less likely to be volunteering to be alone with petitioner, the

24   evidence was subject to Cal. Evid. Code § 352.  However, the undersigned disagrees with

25   petitioner that such an objection would likely have been sustained in that it was important to

26   know if the victim was feeling fearful of petitioner, or to the contrary, whether she was following

petitioner without hesitation.  The prosecutor attempted to bring this out in his very next

questions.  See RT 29-30.  Although prejudicial to petitioner, the evidence would probably have

been permitted, and also, the court cannot find that its confidence in the verdict is undermined by

the admission of the victim's testimony, even if the objection would have been sustained.  After

all, right after she testified about the conversation, the victim testified to an actual encounter

between petitioner and a man on the street in which petitioner was described as about to beat up a

man who asked for a cigarette.  RT 30.[4]  Petitioner forgets to weigh this actual encounter in

asserting prejudice about the conversation about a violent act.

      G.  <u>Ineffective Assistance of Counsel for Failure to Call Three Witnesses Who Could</u>

        <u>Have Impeached the Credibility of the Victim; (This Is a Reprise of Claim 2, Although it</u>

        <u>Starts out as a Reprise of Claim 6)</u>

      The court has determined to hold an evidentiary hearing with respect to the

impeachment witnesses.  No further discussion need be held  here.

      H.  <u>Ineffective Assistance of Counsel for Failure to Properly Advise Petitioner about His</u>

        <u>Right to Testify and Failure to Call Petitioner as a Witness</u>

      Petitioner had an evidentiary hearing on this claim, as well as others, at his motion

for new trial.  He asserted there, as he alleges here, that he wished to testify because the trial

hinged on credibility.  Petitioner acknowledges that his past criminal record could have been

used to impeach him, but since he had no violent felonies on his record, at least his non-juvenile

record,[5] the need for testimony outweighed the possible impeachment.  Petitioner recounts that

he believed he was going to testify, and was taken aback when his counsel informed that he

would not testify.  Petitioner desired to talk to his attorney about this decision, but counsel did

---

    [4] The fact that this conversation at issue was also referenced by Detective Cummings in later testimony, see Amended Petition at para. 125 would have had little extra prejudicial effect. The jury was well aware of it by then.

    [5] Petitioner had been charged and found guilty of a rape when he was a juvenile.

1   not go back to the "lock-up" to discuss this matter.

2          At the new trial motion evidentiary hearing, counsel testified that his reasons for

3   determining to nix petitioner's testimony were that he lacked any credible explanation for the

4   strangulation marks on the victim's neck (petitioner was denying having been the cause for those

5   at the time); counsel was also worried about the negatives from impeachment.  Trial counsel also

6   thought that because much of petitioner's story had been admitted during the detective's

7   testimony, i.e., petitioner's interview with the detective was the subject of testimony, there was

8   no need to subject petitioner to impeachment.

9          Clearly, the decision to testify is a determination that the client ultimately gets to

10  make.[6]  The trial judge at motion for new trial realized this.  However, the judge believed that

11  petitioner was simply not candid when testifying that it had been his determination to testify.

12          As to the defendant not testifying, from the record, the Court can
            only conclude that the decision not to testify was at least conceded
13          to by the Defendant.  The Court addressed this issue and has
            previously made a record in regard to the Court's observations in
14          that regard.  The continued Marsden hearing June 15, the year
            2000, Page 25, line 14, the Court speaking, "I want the record to
15          reflect that after the Defense rested, through and including the
            reading of the first verdict, the Court did not hear any complaint
16          from Mr. Shaw because he had not testified, nor did the Court
            observe an unhappiness from him."  I have not gone back and
17          counted, but I know that there was at least two occasions between
            the time Mr. Prather said "Defense rests" and when the jury was
18          brought back into this courtroom that Mr. Shaw was present in my
            presence, at least immediately outside the door of the courtroom
19          and at least once in the courtroom with the jury not present, and
            Mr. Shaw made no comment to the Court.  The Court would
20          specifically note that Mr. Shaw has never been bashful.  He's very
            articulate.  His demeanor, his body language, his facial
21          expressions, all of those things communicated to the Court at the
            time of trial his satisfaction with the Defense resting when it did.
22          It's the Court's perception that Mr. Shaw's now claim that he
            would have insisted on testifying is simply buyer's remorse after

23

24          [6] See Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551 (2004).  Within that case, the
        Supreme Court stated with respect to the right to testify, and several other rights whose ultimate
25      decision regarding those rights is up to the client: "Concerning these decisions, an attorney must
        both consult with the defendant and obtain consent to the recommended course of action."  Id. at
26      187, 125 S.Ct. At 560.

1   the verdicts were returned.

2   RT 742.

3       At the state court hearing,[7] petitioner proffered that he desired to testify and his

4   counsel did not sufficiently counsel him or let him make that determination.  Clearly, petitioner

5   knew that he could testify at trial, and the trial judge found that petitioner "conceded" to his

6   attorneys's determination that testifying would be a bad idea.  Petitioner has the duty to proffer in

7   this federal case governed by AEDPA, at this time, at least a reasonable possibility that clear and

8   convincing evidence exists that the trial court got it wrong.  28 U.S.C. § 2254(e)(1).  While it is

9   not impossible to make that showing based on the state court record, i.e., an arbitrary finding

10  given the record, in most cases petitioner will have to present some probative evidence aside

11  from that presented in the state court in order to acquire an evidentiary hearing.  United States v.

12  Mejia-Mesa, 153 F.3d 925, 929 (9th Cir. 1998) (§ 2255 motion, if the record is complete, no

13  evidentiary hearing is necessary).

14      Petitioner is simply not entitled to a do-over of the testimony presented in state

15  court with the hope that this federal court might determine the matter differently on a de novo

16  basis.  Petitioner needed to demonstrate that he did not receive a full and fair hearing in state

17  court, and that an evidentiary hearing in federal court would be something more than just a

18  review of what was presented in state court.  Petitioner has not presented a scintilla of evidence

19  in this respect.  The court declines to hold an evidentiary hearing, and petitioner, per force, has

20  failed to present clear and convincing evidence that the trial judge got it wrong.[8]

21  \\\\\

22  \\\\\

23

24      [7] Some of petitioner's contentions were heard at a Marsden hearing which preceded the
motion for new trial.

25      [8] Nor is this a situation where there is even a remote possibility that the court would
clearly find petitioner's testimony vis-a-vis the observations of a judge to be clear and convincing
26  evidence requiring a grant of the writ.

19

1   I. Ineffective Assistance of Counsel for Failure to Investigate the Charged Offenses,

2   Failure to Call Favorable Witnesses, and Presentation of Prejudicial Testimony

3          Petitioner claims that counsel was ineffective for failing to follow-through and

4   require the testimony of David Rogers (Bullwinkle) who was present with petitioner and the

5   victim for part of the prelude to the rape incident.  Rogers was going to testify to his observation

6   of petitioner and the victim drinking, and his perception that petitioner wanted to be alone so that

7   he could have sex with the victim.

8          For starters, the latter perception was immaterial.  One could logically reason that

9   a person intent on sex, however it was to occur, would want to be alone.  This perception in no

10  way detracts from the fact of a later rape.

11         The other testimony concerning drinking and intoxication would have been more

12  probative since the victim told police that she had not been drinking with petitioner.  Along with

13  other potential impeachment noted above, this would stand out, if true, as one more

14  misrepresentation by the victim.

15         Nevertheless, at the evidentiary hearing (new trial motion) trial counsel spoke

16  logically about why he gave up on this witness.  Rogers may well have been the person who

17  supplied petitioner with drugs, and Rogers was adamant that he would not testify to such activity.

18  RT 557.  Although Rogers was under subpoena, Rogers indicated that he would not honor such.

19  When Rogers in fact did not show up at trial, counsel determined that to have this witness

20  arrested and brought to trial.  Rogers had indicated his pre-stated determination to not tell the

21  truth; he was hostile, and he purported to have a failing memory about the events in question.

22  RT 557-559.  Moreover, and not mentioned by counsel, Rogers' testimony would appear

23  inconsistent with what petitioner had told the police because nowhere in Detective Cummings

24  report did petitioner indicate that he had been drinking with the victim.  For all of these reasons,

25  trial counsel made a reasonable tactical decision not to delay the trial for such a witness.  Rogers

26  \\\\\

20

1   had become more trouble than he was worth.  Counsel was not ineffective with respect to witness

2   Rogers.

3                Counsel also faults trial counsel for not calling Ronnie Niebuhr who would also

4   testify that he saw petitioner and the victim drinking – this time *in* the Guys and Dolls bar.

5   Niebuhr would also testify that the victim was intoxicated.  Counsel explained:

6             I had made a decision at that point that our defense had totally
          turned to garbage.[9] My feeling was that given that the witness was I
7         believe in custody at the time I was concerned about the negative
          aspects of how he would come across.  Also what I was concerned
8         about was that with that witness being in custody plus Mr. Shaw
          being in custody at that time on cross-examination– potential
9         cross-examination by Mr. Enos if that was going to be inquired of
          the two of them had talked about the case and discussed what the
10        potential testimony was going to be.

11  RT 569-570.

12               Again, counsel was reasonable.  Petitioner had never indicated that he met the

13  victim in the bar, and had been drinking with her for sometime.  Trial counsel was not ineffective

14  simply because he did not call any and every potential witness regardless of the inconsistencies in

15  their testimony, and regardless of petitioner's statements to the police.  While it may have been

16  true that the victim falsely testified that she had no alcohol late into the incident night (because of

17  her BAC at the time she was examined in the morning), presentation of these witnesses would

18  have made it appear that petitioner was simply fabricating the important facts regarding his

19  meeting of the victim.

20               Finally, petitioner takes issue with the counsel's calling of Bobbie Paige Cooper.

21  While she was certainly not a dynamite witness for the defense, this witness was not all bad as

22  petitioner's present counsel paints her.  On direct, Cooper told the jury that she had only met

23  petitioner that night; she was associated with David Rogers.  She was one of the four in the group

24  looking for a place to stay that night.  She testified that the victim did not ever tell her that she

25  _____

26       [9] Counsel was correct when viewing all the testimony of the defense witnesses.

                                         21

1   was concerned about petitioner, even when the two women were alone for a time.  RT 262-266.

2   On cross-examination, Cooper testified in response to a question whether petitioner was a violent

3   person:

> He- no.  I asked David– I asked Bull, I said, "you know, what's up
> with dude?"  And he said– you know, we were joking around, "Oh,
> he's mean and crazy.  Stay away from him," but he's playing you
> know, because that's how they are as far as I understand, They're
> peckerwoods.  They're all mean and crazy.

7   RT 269.

8          This testimony was simply not as damning as petitioner argues it to be.  In the

9   course of "joking around," petitioner was characterized by his "friend" as "mean and crazy."

10  While "peckerwood" was afterwards defined as a "Hells' Angel" type, it is difficult to find that

11  this description was not much diluted by what Cooper had said before.  Moreover, this testimony,

12  obtained on cross-examination did not significantly detract from the witness' prior testimony that

13  the victim did not seem much concerned about petitioner in terms of his dangerousness.  Counsel

14  was not ineffective for calling this witness to describe many of the events that night; in any event,

15  it can hardly be said that the outcome would probably have been different if this witness had not

16  been called.

17         J.  Ineffective Assistance of Counsel Due to Poor Cross-examination

18         At the end of the victim's cross-examination, trial counsel began a series of

19  questions asking her if she had said something (presumably inconsistent with her previous trial

20  testimony) to the investigating officers.  Trial counsel did not use the victim's preliminary

21  hearing testimony for impeachment.  Petitioner takes issue with this, and points to several

22  inconsistencies in her trial testimony when compared to the preliminary examination:

23         1. The victim's trial testimony of an encounter between petitioner and a homeless

24  person in which petitioner threatened to beat up that person – petitioner had not testified to such

25  in the preliminary examination;

26  \\\\\

2.  The victim's much more "forceful" testimony at trial describing the way in which petitioner got the victim into the shed where the rape occurred, including that petitioner used two arms and not just one;

3. Trial testimony indicating that petitioner used greater force in getting the victim to the floor than was mentioned at the preliminary examination;

4.  Not emphasizing the victim's statement made at preliminary examination that petitioner's state of mind was one in which he believed that he was paying for sex with drugs;

5.  Failure to confront the victim with her preliminary examination testimony in which she had testified that petitioner was gone when she regained consciousness, but that she indicated during the Detective Cummings interview that petitioner was present when she regained consciousness and indeed struggled with petitioner at that time.

The undersigned has reviewed the entirety of the cross-examination, and agrees that counsel could have done a better job.  Until the questions about what she had told the police were asked, the cross-examination was a rather mindless repetition of what had been asked on direct.  Perhaps trial counsel was simply hoping that the witness would divulge a dispositive inconsistency, but such a speculation is hardly a planned cross-examination.

On the other hand, the undersigned will not fault counsel for failing to use the preliminary examination inconsistencies to impeach trial testimony.  Except with respect to the consciousness issue, the preliminary examination testimony was fairly consistent with what had been told to the officers.  It seems obvious that trial counsel was attempting to set up and emphasize the inconsistencies between what the victim had told the police and some inconsistencies at trial.  These inconsistencies would be again heard by the jury during the officers' testimony.  Referencing the same inconsistencies by virtue of the preliminary examination testimony, or adding a few more inconsistencies by reference to the preliminary examination, would not have added that much.  An argument can be made that other counsel may have desired to use the preliminary examination transcript, but the argument is insufficient to

1    demonstrate that counsel acted unreasonably.

2           Moreover, petitioner is simply wrong in his assertion that the victim's on-the-floor

3    speculation of what may have been in petitioner's mind when he gave her some drugs

4    (immediately prior to the rape) is necessarily probative of petitioner's state of mind when the two

5    first met and decided to walk away from the bar location.  It could be argued that it was every bit

6    as likely that the frustrated petitioner gave her the drugs as a last minute devised attempt to quiet

7    her down, or as a unilaterally devised justification for what he was about to do.  In addition, even

8    if petitioner had initially intended to attempt to buy the victim's consent with drugs, *his* state of

9    mind at the time just prior to sexual intercourse says little about whether the victim ever agreed

10   to such.

11          The instances of asserted ineffectiveness would not likely have changed the

12   verdict in this case, i.e., confidence in the outcome of the trial is not undermined.

13          K.  Whether Petitioner's Right to a Jury Trial Was Violated When Jury Was Instructed

14              That the Shed in Which Sex Occurred Was "Closed to the Public" as a Matter of Law

15          Respondent is not correct in viewing this issue as simply a "failure to instruct"

16   issue; it is an Apprendi issue where the judge took a factual finding away from the jury.

17   However, petitioner is incorrect in quibbling with the "beyond a reasonable doubt" language used

18   by the California Court of Appeal.  Indeed, the Ninth Circuit has held en banc that Apprendi

19   errors are to be reviewed in habeas under the Brecht v. Abrahamson,[10] "substantial and injurious

20   effect" standard.  Medley v. Runnels, 506 F.3d 857, 867 (9th Cir. 2007) (en banc).  The Court of

21   Appeal utilized the appropriate "beyond a reasonable doubt"standard of review of such errors on

22   direct review.  See below.  For the reasons given by the Court of Appeal, and those in addition to

23   those set forth here, the trial court error was harmless beyond a reasonable doubt, and in any

24   event certainly did not have a substantial and injurious effect on the verdict.

25   _____

26          [10] 507 U.S. 619, 637, 113 S. Ct. 1710 (1993).

1          Under California law in place at the time petitioner committed his crimes, if "the

2   defendant committed the present offense [rape]....during the commission of a burglary of a

3   building, including any commercial establishment, which was then closed to the public, in

4   violation of Section 459," Cal. Penal Code 667.61(e)(2), that defendant could be sentenced to 15

5   years to life (or 25-life is two circumstances of subsection (e) were satisfied).  The issue in this

6   case involves whether the building was "closed to the public."[11]

7          The trial judge gave a burglary instruction, RT 340, and instructed the jury that it

8   had to find true or not true the truth of the assertion that the rape was committed during the

9   course of a burglary, but did not give any instruction advising about the requirements of §

10   667.61(e)(2), i.e., that the burglary had to be of an inhabited dwelling,[12] or a building that was

11   "closed to the public."  Thus, the jury was never asked to find a fact necessary for the

12   enhancement.

13          The Court of Appeal found that the trial court had erred, but found the error

14   harmless under Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967) (beyond a reasonable

15   doubt).

16          Here, the record demonstrates the scene of the crime was a vacant
         (or abandoned) shed behind two vacant (or abandoned) houses.  A
17         photograph of the houses and the relationship between the shed and
         the street were provided to the jury.  The photograph demonstrates
18         the property was unquestionably private.  The door of the shed was
         on the side of the building and faced away from the street.  Further,
19         the victim protested to the defendant that it would be trespassing to
         go into an abandoned building at the time he forced her toward the
20         shed.  The parties also stipulated the owner of the shed had not
         given the defendant permission to use his shed.

21
         Moreover, the crime took place after midnight. At that time, almost
22         any building, let alone an abandoned shed on private property,
         would be commonly understood to be "then closed to the public"

23

24          [11] California law has since been changed and the words at issue here no longer appear in
25   the statute.

26          [12] There was no contention that the shed in which the victim was raped was an inhabited
   building.

1
>   because of the lateness of the hour, even if the public had access at
>   other times.

2

3
>   When the factual circumstances of the crime scene are considered
>   together-an abandoned shed, between abandoned buildings, on
>   private property, after midnight, where the owner has not

4
>   consented to entry-a rational jury could only find that the crime
>   took place during a burglary committed in a building "then closed

5
>   to the public," within the meaning of Penal Code section 667.61,
>   subdivision (e)(2).

6

7
People v. Shaw, 2003 WL 22293580 *9 (Cal. App. 2003).

8
Petitioner is incorrect in choosing synonyms for "beyond a reasonable doubt"

9
contained in Supreme Court opinions (below) as indicating that the standard of review here is

10
even above that of beyond a reasonable doubt, at least on direct review.

11
>   Although our prior case law may suggest otherwise, the Supreme
>   Court recently held that Apprendi errors are reviewed under the

12
>   harmless error standard as applied in Neder v. United States, 527
>   U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).  Washington v.

13
>   Recuenco, --- U.S. ----, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006).

14
>   Under Recuenco and Neder, an error is harmless if the court finds
>   beyond a reasonable doubt that the result "would have been the

15
>   same absent the error." Neder, 527 U.S. at 19, 119 S.Ct. 1827.
>   Neder explained that where the record contains "overwhelming"

16
>   and "uncontroverted" evidence supporting an element of the crime,
>   the error is harmless.  Id. at 17, 18, 119 S.Ct. 1827. Conversely, the

17
>   error is not harmless if "the defendant contested the omitted
>   element and raised evidence sufficient to support a contrary

18
>   finding." Id. at 19, 119 S.Ct. 1827.

19
United States v. Zepeda-Martinez, 470 F3d 909, 913 (9th Cir. 2006).

20
Perhaps, petitioner is simply arguing that the application of Neder by the appellate

21
court was an unreasonable application of that authority.  Petitioner posits this assertion on the

22
novel proposition that an "abandoned" shed, i.e., not inhabited, was "open to the public" because

23
of California's adverse possession law.  The theory is a super-stretch in any event, but the simple

24
answer in this case is that there is no evidence whatsoever that petitioner, who was intent on

25
making a one night stand, whether consensually or otherwise, had any intent to permanently take

26
over the shed pursuant to California's adverse possession law.  Petitioner's cited case of People

1    v. Lapcheske, 73 Cal. App. 4th 571 (1999) is easily distinguishable on that point alone.  And,

2    petitioner cannot seriously contend that out buildings on private property are all "open to the

3    public" simply because they are not inhabited by people.  Moreover, there is no evidence

4    whatsoever that the owner of the shed had abandoned the shed in any legal sense, i.e., had

5    determined not to exercise ownership/possession over the shed.  The evidence is to the contrary

6    in that the owner determined to demolish the shed a few days after the incident in this case.

7    Persons without an ownership interest generally have no right to demolish property.  Petitioner

8    cannot contest the harmless error determination of the California appellate court herein on a

9    problematic, *theoretical* factual basis for which there was *no* evidentiary support in the record.

10           Because the application of the facts of record by the California Court of Appeal to

11   the harmless error analysis was eminently reasonable, petitioner's claim herein fails.

12           L. Ineffective Assistance of Counsel Regarding Failure to Investigate Petitioner's

13           Mental Illness

14           Petitioner asserts that he has a lengthy history of diagnoses of mental illness

15   (allegedly bipolar disorder, ADHD, drug induced psychosis and schizophrenia), and had taken

16   psychiatric medications before in his life.  Petitioner presented an affidavit in state court from

17   petitioner's mother who confirmed petitioner's mental health history.  Trial counsel is faulted for

18   not having investigated petitioner's mental health because "[s]uch evidence would have tended to

19   undermine the prosecutor's theory that petitioner formed the requisite *mens rea* for the charged

20   offenses."  Amended Petition at 52.  Petitioner has presented no report, declaration, or other

21   document from a medical professional rendering any such opinion.  Petitioner's opinion is

22   wholly speculative, much less wholly inconsistent with his other theories herein.

23           In California, the doctrine of diminished capacity has long since been abandoned,

24   and, as petitioner notes, mental health evidence is only relevant if it demonstrates that petitioner

25   actually did not form the intent required for particular crimes.  See People v. Williams, 16 Cal.

26   4th 635, 677, 66 Cal. Rptr. 2d 573 (1997).  Quite clearly, the mere presence of a mental health

history says little about the actual formation of a particular intent at a particular time.  Moreover, petitioner's positions in this habeas proceeding completely belie an allegation of mental defectiveness to the point where intent was not formed.  Petitioner freely concedes herein that he formed an intent to have sex that night – only he asserted it would be a sex for drugs exchange.  No explanation is made about how one can form an intent to have sex, but not the intent to rape or burgle.  He affirmatively sought the "right place" to have sex, and was able to make judgments about not going into certain places for that to happen.  He does not allege that he was acting in a drug induced stupor or psychosis; he does not allege he was under the influence of drugs at all during the events in question.  Petitioner does not assert that he did not understand the things which were transpiring that night, and professes that he remembers them quite well.  No evidence at all suggests that petitioner was acting as some type of automaton due to mental disease.  Petitioner does not relate how a past diagnosis of depression and manic periods, or attention deficit hyperactivity disorder relates at all to the presence of the diseases at a particular time, and most importantly, the formation of intent at that time.

In sum, this inconsistent claim is baseless and non-colorable; such claims do not warrant an evidentiary hearing.  See United States v. Leonti, 326 F.3d 1111, 1116 (9th Cir. 2003) ( §2255 motion).

*Conclusion*

IT IS HEREBY ORDERED that an evidentiary hearing is ordered for Claim 2 above (ineffective assistance of counsel for failing to renew the effort to have the "drugs for sex" witnesses testify).  Counsel shall contact the undersigned's clerk for an evidentiary hearing date approximately 3-4 months in the future.  Counsel shall exchange an exhibit and witness list no later than 10 calendar days prior to the scheduled hearing date; an actual exchange of exhibits shall take place on the designation date.  Failure to designate/exchange exhibits or designate witnesses shall result in a preclusion of the proffered evidence/testimony unless good cause exists for not designating/exchanging.

1    Any request for reconsideration of this order shall be made within the time limits

2    set for objections to the Findings and Recommendations set forth below.

3    IT IS HEREBY RECOMMENDED that with the exception of Claim 2 above, all

4    other claims be denied.

5    These findings and recommendations are submitted to the United States District

6    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

7    days after being served with these findings and recommendations, any party may file written

8    objections with the court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10   shall be served and filed within ten days after service of the objections.  The parties are advised

11   that failure to file objections within the specified time may waive the right to appeal the District

12   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13   DATED: 03/17/08

14                                                 /s/ Gregory G. Hollows
                                                   _____
15                                                 UNITED STATES MAGISTRATE JUDGE

16   GGH:gh:035
     shaw1506.157

17

18

19

20

21

22

23

24

25

26